953 So.2d 802 (2007)
Thurman and Rosemary KAISER
v.
Harry HARDIN and United Services Automobile Association.
No. 2006-C-2092.
Supreme Court of Louisiana.
April 11, 2007.
*804 McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Peter Joseph Wanek, Lynda Albano Tafaro, Metairie, for applicant.
George F. Kelly, III, for respondent.
PER CURIAM.
Defendants, Harry Hardin and United Services Automobile Association ("USAA"), seek review of a ruling of the court of appeal which amended the trial court judgment to increase plaintiffs' damage award. For the reasons that follow, we now reverse the judgment of the court of appeal and reinstate the trial court's judgment.

UNDERLYING FACTS AND PROCEDURAL HISTORY
By way of background, plaintiffs, Thurman and Rosemary Kaiser, both of whom are in their mid-70's, were involved in a total of three separate automobile accidents during the span of three and a half weeks. The first accident occurred on December 28, 2000, when plaintiffs were involved in a rear-end collision with Leon Parker in Jefferson Parish.[1] On January 15, 2001, plaintiffs were involved in a second accident when their vehicle was rearended by Harry Hardin at the intersection at St. Charles Avenue and Euterpe Street in Orleans Parish. Finally, on January 22, 2001, plaintiffs were involved in a third accident when Amy Mullen backed her vehicle out of a service alley onto Lane Street and collided with plaintiffs' vehicle.
The instant litigation began when plaintiffs filed suit against Mr. Hardin and his insurer, USAA, based on the January 15, 2001 accident.[2] Prior to trial, Mr. Hardin stipulated to liability. The case then proceeded to a jury trial on the issue of damages.
At trial, Mr. Hardin, testified that he hydroplaned into the back of plaintiffs' vehicle on the St. Charles Avenue. According to Mr. Hardin, plaintiffs told him that they weren't injured and did not need medical attention. He testified that his *805 vehicle did not receive any damage from the accident, but that plaintiffs' vehicle had minor damage to its bumper.
Mrs. Kaiser testified that she suffered a stroke in October 2000, three months before the accident. She explained that she experienced tingling in two of her fingers as a result of the stroke. She also admitted that on December 28, 2000, two weeks prior to her accident with Mr. Hardin, she and Mr. Kaiser were rear ended in a car accident on the service road near Transcontinental Boulevard in Jefferson Parish. She stated that she was not injured in this accident. Two weeks later, on January 15, 2001, Mr. Hardin rear ended her husband's Nissan truck on St. Charles Avenue. Mrs. Kaiser testified that she felt immediate pain but did not go to the hospital because she believed her pain would not last. She first sought treatment two days after the accident with Dr. French at the Pontchartrain Bone and Joint Clinic, complaining of neck pain extending into her arms and numbness in her left fingers and thumb. According to Mrs. Kaiser, Dr. French prescribed various medications, including Celestone shots in her shoulder, as well as physical therapy. On January 22, 2001, after she saw Dr. French, Mrs. Kaiser was involved in a third car accident when Amy Mullen backed out of a service alley and hit plaintiffs' car. Mrs. Kaiser testified that this accident was not as severe as her second accident because she saw the car backing toward her and was able to brace her arms against the dashboard to prepare for the jolt.
Mrs. Kaiser testified that she continued to seek treatment from Dr. French for a year, until he moved away, at which time she sought treatment for two or three years from Dr. Sketchler. She asserted that she continues to suffer from the same symptoms since her January 15th accident and that she must visit Dr. Sketchler every three months for her injections.
On cross examination, Mrs. Kaiser admitted that she made a claim for soft tissue injuries which she sustained as a result of the first accident of December 28, despite her current testimony that she was not injured in that accident. When asked about the police report, which indicated that she suffered a possible injury as a result of the first accident, she indicated the report was wrong because she never spoke to the officer. Mrs. Kaiser also admitted that she never told the police officer she was injured after the second accident of January 15, but asserted that she told Mr. Hardin that she was "hurting." Mrs. Kaiser claimed that Dr. French's records, which indicated Mrs. Kaiser had been suffering from her symptoms for one month prior to the second accident were inaccurate. Finally, she admitted that the property damage caused to the Kaiser vehicle in the third accident of January 22 was much more extensive and expensive than the property damage caused by the second accident of January 15.
Mr. Kaiser testified next. He testified that after the first accident, he was shook up and felt discomfort in his right shoulder and left arm, but did not seek medical attention. He stated that his vehicle sustained approximately $362.00 in damage as a result of the second accident and opined that the second accident was much more severe in impact than the first accident. According to Mr. Kaiser, his right biceps slipped down to his elbow as a result of the impact of the second accident; however, he explained that he immediately pushed his right biceps back into place and it remained in a straightened position. He also experienced pain in his right shoulder. Mr. Kaiser acknowledged that he did not immediately seek medical treatment for *806 his pain. In addition, Mr. Kaiser testified that in his opinion the third accident was not nearly as severe as the second accident.
According to Mr. Kaiser, he first sought treatment with Dr. Persich, his family doctor, for his shoulder and biceps injuries about two months after the second accident when his injuries appeared to be getting worse. At Dr. Persich's recommendation, Mr. Kaiser sought treatment from Dr. French at the Pontchartrain Bone and Joint Clinic. Mr. Kaiser testified that he only told Dr. French about his second accident "because the second one did me in." He testified that Dr. French told him he had a ruptured biceps tendon and recommended physical therapy, which Mr. Kaiser attended twice a week. Mr. Kaiser testified that Dr. Sketchler, who began to see him after Dr. French left the Pontchartrain Bone and Joint Clinic, told him that he would eventually require surgery on his torn rotator cuff. Mr. Kaiser testified that after the accident, his sexual activity was curtailed, that he could no longer play football, garden, or cut the grass.
On cross examination, Mr. Kaiser acknowledged that he told his attorney he suffered discomfort in his right shoulder and left arm after the first accident. He also acknowledged his interrogatories indicated that he suffered soft tissue injuries and neck pain as a result of the first accident, but claimed that he didn't remember anyone telling him that he suffered soft tissue injuries. He also acknowledged that Dr. French told him he had severe degenerative arthritis in both shoulders, which likely predated the accident.
Dr. Donald French's deposition was entered into the record. In his deposition, Dr. French, an orthopedic surgeon, testified that he first saw Mr. Kaiser in March 2001 when Mr. Kaiser sought treatment for injuries sustained in the second accident of January 15, 2001. At that time, Mr. Kaiser reported that he suffered pain in both shoulders, and an abnormality in his right arm. Dr. French testified that Mr. Kaiser appeared to have suffered a biceps tendon rupture in the right arm and that x-rays revealed degenerative changes of the humeral heads in both shoulders and spurring in both shoulders which would have developed over a long period of time predating the accident. During that first visit, Mr. Kaiser did not mention that he was involved in two other automobile accidents. Dr. French admitted that the degeneration in Mr. Kaiser's shoulder could have caused the biceps rupture and that there was no way to date exactly when the rupture occurred. Dr. French prescribed physical therapy for Mr. Kaiser and gave him cortisone shots in the shoulder. Dr. French also opined that it was medically impossible for Mr. Kaiser to put his biceps tendon back into place.
With regard to Mrs. Kaiser, Dr. French indicated that she first sought treatment at his office on January 17, 2001 with complaints of neck pain as well as numbness in the upper left extremity or the left arm. At that time, Mrs. Kaiser did not inform Dr. French of her December 28, 2000 accident, but only related the details of her January 15, 2001 accident. Dr. French reported that Mrs. Kaiser's x-rays revealed degenerative changes of the cervical spine which predated the January 15th accident. As a result of her injuries, Dr. French prescribed physical therapy which Mrs. Kaiser attended from February 2001 to July 2001. Dr. French opined that Mrs. Kaiser has suffered a pinched nerve after her stroke, but that the accident would not have aggravated it. Dr. French testified that it was not more probable than not that the January 15th accident aggravated Mrs. Kaiser's degenerative *807 disease any more than the December 28th or January 22nd accident. He also testified that he gave Mrs. Kaiser cortisone injections once every three to four months in addition to physical therapy.
Paul Van Hoose, a claim representative employed by State Farm, was the next witness to testify. Mr. Van Hoose testified that plaintiffs had filed uninsured motorist claims against State Farm for all three accidents. He testified that plaintiffs made personal injury claims for all three accidents. With regard to the December 28th accident, Mr. Kaiser made a claim for personal injuries including headaches, right shoulder pain, sore neck and an earache and Mrs. Kaiser made a claim for neck and shoulder pain. With regard to the January 22nd accident, Mrs. Kaiser reported that her neck was sore and Mr. Kaiser reported neck and back injuries. With regard to the January 15th accident, Mrs. Kaiser reported neck, right shoulder, and arm injuries (both arms) and Mr. Kaiser did not report a specific injury.[3]
Dr. Wendy Jamison, a neurologist, testified next. Dr. Jamison testified that she first saw Mrs. Kaiser on October 5, 2000 for complaints of numbness in her left arm and her left leg, numbness in her face, and tingling in her fingers, which Dr. Jamison diagnosed as a stroke. Dr. Jamison opined that the stroke reduced the strength in Mrs. Kaiser's left-hand grip and that this reduced strength could contribute to Mrs. Kaiser's limited strength in her left arm.
Dr. Jamison next saw Mrs. Kaiser on February 1, 2001, complaining of neck pain. At that time, Mrs. Kaiser informed Dr. Jamison that she had been involved in three car accidents since her stroke. Mrs. Kaiser reported she had suffered no injuries in the first accident, had been diagnosed with whiplash after the second accident and believed the third accident aggravated her neck pain. Dr. Jamison testified that Mrs. Kaiser's complaints were consistent with the type of injuries involved in a rear-end accident. Dr. Jamison opined that Mrs. Kaiser suffered from arthopathy and sclerosis and that these conditions would cause Mrs. Kaiser to be more affected by a rear-end collision than a normal person. Dr. Jamison also testified that Mrs. Kaiser complained of headaches on her first visit after her stroke, that Mrs. Kaiser told her the headaches predated the stroke, and that Mrs. Kaiser regularly took four to six Anacins in a day to treat the headaches. Dr. Jamison also testified that a vehicle accident could aggravate the weakness Mrs. Kaiser suffered as a result of her stroke.
Dr. Jeffrey Sketchler, an orthopedic surgeon, was the next witness to testify. Dr. Sketchler first saw Mrs. Kaiser on February 25, 2002 for complaints of pain in her left shoulder, discomfort in the neck, and numbness, tingling, and pain which radiated down her left arm.[4] Upon examination, Dr. Sketchler believed that Mrs. Kaiser suffered from some spurring and some degeneration of the rotator cuff, which he opined may have happened when Mrs. Kaiser extended her hand to the dashboard of the vehicle upon impact during the January 22nd accident. Dr. Sketchler opined that an MRI of Mrs. Kaiser revealed a considerable amount of preexisting degeneration *808 of the neck with some disc bulges and some spurring within the neck, which is consistent with Mrs. Kaiser's age. Dr. Sketchler continued Dr. French's treatment of giving Mrs. Kaiser periodic cortisone injections every three or four months. He also testified that the MRI revealed foraminal compromise, which essentially means a tightening of the nerve passage. He testified that in light of Mrs. Kaiser's age and prior medical history, she was predisposed for an injury in a rear-end collision. Dr. Sketchler opined that Mrs. Kaiser's condition probably would not get better, but would also not get worse and she would continue to require cortisone injections for the rest of her life. He also testified that she was not a candidate for surgery because of her age.
Dr. Sketchler also testified that he saw Mr. Kaiser for the first time in February 2002. At that time, he diagnosed Mr. Kaiser with a ruptured biceps tendon, which is not uncommon for elderly men. By 2004, Mr. Kaiser's shoulder began to get worse and Dr. Sketchler ordered an MRI, which revealed a tear in the rotator cuff. After viewing the results of the MRI, Dr. Sketchler recommended that Mr. Kaiser undergo surgery to repair the rotator cuff, which would cost around $1800-$2200. Dr. Sketchler also testified that if someone with degenerative arthritis, such as Mr. Kaiser, suffered a trauma, that trauma might aggravate the arthritis but would return to a baseline of where they were before the trauma.
At the conclusion of trial, the jury rendered a verdict in favor of plaintiffs. It awarded $6,500 in total damages to Mr. Kaiser, consisting of $1,500 in past medicals, $1,500 in future medicals and $3,500 in general damages. As to Mrs. Kaiser, the jury awarded $20,000 in total damages, consisting of $3,500 in past medicals, $3,200 in future medicals, and $13,300 in general damages.
The district court signed a judgment consistent with the jury's verdict. Plaintiffs moved for a new trial, which the district court denied.
Plaintiffs appealed, seeking review of the damage award. In an opinion not designated for publication, the Court of Appeal, Fourth Circuit amended the judgment to increase plaintiffs' damages. Kaiser v. Hardin, 05-0792 (La.App. 4th Cir.7/19/06), 933 So.2d 260, 2006 WL 2136016 (unpublished). Specifically, the court of appeal increased Mrs. Kaiser's award of past medical expenses from $3,500 to $7,734.86 and increased her general damage award from $13,200 to $30,000. It increased Mr. Kaiser's past medical expenses from $1,500 to $4181.50, increased his future medical expenses from $1,500 to $7,000 and increased his general damages from $3,500 to $30,000.
Upon application by Mr. Hardin and USAA, we granted certiorari to consider the correctness of that ruling. Kaiser v. Hardin, 06-2092 (La.11/17/06), 942 So.2d 521.

DISCUSSION

GENERAL DAMAGES
In Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, we set forth the standard for appellate review of general damage awards:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Keeth v. Dept. of Pub. Safety & Transp., 618 *809 So.2d 1154, 1160 (La.App. 2 Cir.1993). Vast discretion is accorded the trier of fact in fixing general damage awards. La.Civ.Code art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
* * *
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv., Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
With these principles in mind, we now turn to a review of the general damage awards in this case.

Mr. Kaiser
The jury awarded Mr. Kaiser general damages in the amount of $3,500. In increasing this award to $30,000, the court of appeal recognized that Mr. Kaiser's testimony that he pushed his biceps muscle back in place following the accident was a medical impossibility. Nonetheless, the court felt this conclusion did not diminish the "glaring fact" that Mr. Kaiser experienced "some muscular damage as a result of the rear end collision." As support, the court of appeal pointed to the testimony of Dr. French and Dr. Sketchler, who both testified that it would be unusual for Mr. Kaiser to not have experienced some degree of pain at the time the biceps muscle ruptured.
Based on our review of the record, we cannot say the jury's award represents an abuse of its vast discretion. Although the medical testimony revealed Mr. Kaiser suffered a biceps tendon rupture or rotator cuff tear, the only evidence which connected this injury to the second accident was Mr. Kaiser's own testimony. The jury could have viewed this testimony with some skepticism, given the medical impossibility of Mr. Kaiser's statement that he pushed his biceps tendon back into place. Additionally, the medical testimony suggested that causes unrelated to the accident, such as age-related degeneration, could be responsible for some of Mr. Kaiser's condition.
Considering the record as a whole, we believe the jury concluded Mr. Kaiser suffered some muscle aches as a result of the second accident. An award of $3,500 for such injuries does not represent an abuse of the jury's vast discretion. The court of appeal erred in disturbing this award.

Mrs. Kaiser
The jury awarded Mrs. Kaiser $13,200 in general damages. In increasing this award to $30,000, the court of appeal observed that "[i]t is not a stretch to take notice that even a minor injury to an elderly person could prove to be relatively substantial." The court further explained that Mrs. Kaiser's stroke, which preceded the *810 accident, should in no way impede her general damages claim.
Mrs. Kaiser's primary complaint following the accident was pain and discomfort in her neck as well as weakness in her shoulders and arms. However, the medical evidence indicated that Mrs. Kaiser suffered from degenerative changes of the cervical spine which pre-dated the accident. The testimony also revealed that it was unlikely that the second accident aggravated her condition any more than the first or third accidents.
Considering the record as a whole, we believe the jury concluded that some of Mrs. Kaiser's complaints were related to the second accident, but found that much of her injuries were either pre-existing or attributable to the other accidents. An award of $13,200 for such injuries does not represent an abuse of the jury's vast discretion. The court of appeal erred in disturbing this award.

SPECIAL DAMAGES
Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. McGee v. A C and S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770. In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Guillory v. Ins. Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029. Therefore, we now turn to a discussion of whether the jury's award of special damages was based on manifestly erroneous factual findings.

Mr. Kaiser
Although Mr. Kaiser requested $4,180.50 in past medical expenses, the jury awarded him only $1,500. In awarding the full $4,180.50 in past medical expenses for Mr. Kaiser, the court of appeal reasoned that "the jury to some extent believed his trial testimony and attributed his injuries to the January 15th accident."
As discussed earlier, the jury's general damage award in this case suggests it found some, though not all of Mr. Kaiser's injuries resulted from the second accident. This finding is not clearly wrong, as the medical testimony establishes Mr. Kaiser's injuries could have resulted from other causes, such as age-related degeneration or been due to the other accidents. The $1,500 award in past medical expenses is consistent with a finding that Mr. Kaiser suffered some muscle aches from the accident, but was not entitled to recover all of his requested expenses.
The jury awarded Mr. Kaiser in $1,500 in future medical expenses. In increasing this award to $7,000, the court reasoned that by making some award for future medical expenses, the jury must have found Mr. Kaiser would require some medical treatment in the future as a result of the second accident. Citing Dr. Sketchler's testimony, the court reasoned that Mr. Kaiser would need to undergo surgery to repair his torn rotator cuff. Therefore, the court of appeal increased the award to cover the full cost of this surgery.
In refusing the make a full award of future medical expenses, the jury obviously concluded that Mr. Kaiser's torn rotator cuff did not result from the second accident. In order to reverse that factual finding, the court must find that there was no reasonable factual basis for the jury's finding.
*811 Our review of the record indicates there was no testimony specifically connecting the torn rotator cuff to the second accident. Dr. Sketchler admitted he did not diagnose the torn rotator cuff until 2004, over three years after the second accident. Under these circumstances, we cannot say the jury was clearly wrong in refusing to award future medical expenses in connection with the rotator cuff surgery.[5]

Mrs. Kaiser
The jury awarded Mrs. Kaiser past medical expenses in the amount of $3,500. In increasing this award to the full $7,734.86 requested by Mrs. Kaiser, the court of appeal determined these medical expenses resulted from the second accident of January 15. The court reasoned that neither Mrs. Kaiser's stroke nor the pre-existing degenerative problem involved neck and shoulder pain and found "[t]hose complaints conceivably developed after the January 15, 2001 accident."
The question of whether it is "conceivable" that Mrs. Kaiser's neck and shoulder pain originated from the second accident is irrelevant for purposes of the manifest error analysis. Instead, in order to reverse the jury's factual finding that all of Mrs. Kaiser's expenses did not result from the second accident, the court must find there is no reasonable factual basis for this conclusion.
A review of the medical testimony indicates that Mrs. Kaiser suffered a stroke and had age-related degenerative changes, both of which pre-dated the second accident. Additionally, defendants also put on evidence which disputed Mrs. Kaiser's testimony that she was injured in the second accident only. Paul Van Hoose, the claim representative for State Farm, testified that Mrs. Kaiser made personal injury claims for all three accidents. Moreover, Dr. French's records indicated that Mrs. Kaiser presented at his office two days after the second accident, complaining that she had been suffering neck and arm pain for approximately one month-well before the second accident. Considering this evidence, we believe there was a reasonable factual basis for the jury's finding that only part of the medical expenses claimed by Mrs. Kaiser was attributable to the second accident.

CONCLUSION
Based on our review of the record, we find the jury's general damage award does not represent an abuse of the jury's vast discretion. Additionally, we find the jury's award of special damages is consistent with its factual findings, which are supported by the record. Accordingly, the court of appeal erred in disturbing the general and special damage awards. Insofar as the court of appeal increased the damage awards, we must reverse its judgment and reinstate the judgment of the district court.

DECREE
For the reasons assigned, the judgment of the court of appeal, insofar as it increased the damage awards in favor of Thurman Kaiser and Rosemary Kaiser, is reversed. The judgment of the district court is reinstated and affirmed in its entirety. All costs in this court are assessed against plaintiffs.
NOTES
[1] This accident was settled out of court. The driver was uninsured and plaintiffs settled with their uninsured motorist carrier.
[2] Plaintiffs also named Ms. Mullen and her insurer, State Farm Mutual Automobile Insurance Company, as defendants, based on the January 22, 2001 accidents. Plaintiffs settled with these defendants prior to trial. Accordingly, we will not discuss these defendants further.
[3] The claim report identified Mr. Kaiser's injury as "unknown." On cross examination, Mr. Van Hoose clarified that State Farm was aware that Mr. Kaiser planned to make a personal injury claim, but was simply unaware of the nature of the claim.
[4] Dr. Sketchler essentially continued Dr. French's treatment when Dr. French moved his practice to Tennessee.
[5] Likewise, we do not find it inconsistent that the jury awarded some, though not all, of the requested future medical expenses. The jury could have reasonably concluded that Mr. Kaiser would have some future medical expenses, such as expenses for physical therapy, which resulted solely from the second accident.